ROBERT E. STANIFER, JR.,      )
            )
    Plaintiff,        )
            )
      v.        )   Case No. 4:13-CV-053-JD
            )
CAROLYN W. COLVIN,      )
Commissioner of Social Security,  )
            )
    Defendant.       )

## OPINION AND ORDER

On July 31, 2013, Plaintiff Robert E. Stanifer, Jr., filed his Complaint in this Court seeking review of the final decision of the Defendant Commissioner of Social Security (Commissioner). [DE 1.] The Commissioner filed an Answer on December 17, 2013. [DE 13.] On March 3, 2014, Stanifer filed his opening brief [DE 20], to which the Commissioner responded on May 30, 2014. [DE 26.] Stanifer filed a reply on June 30, 2014. [DE 33.] Accordingly, the matter is now ripe for decision. Jurisdiction is predicated on 42 U.S.C. § 405(g).

## I. Procedural History

Stanifer filed an application for disability insurance benefits on December 23, 2010. (Tr. 121.) His application was denied initially on March 4, 2011, and again upon reconsideration on May 25, 2011 (Tr. 74, 77.) On June 28, 2012, a hearing was held before Administrative Law Judge Laurel Greene. (Tr. 39-67.) On August 27, 2012, ALJ Greene issued a decision denying the claim. (Tr. 19-33.) The Appeals Council denied a request for review on May 29, 2013, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.).

## II. Facts

Stanifer was born on December 1, 1952 and was 59 years old on the date the ALJ rendered her decision. (Tr. 33, 121.) Stanifer reported a lengthy work history as a maintenance facilitator, maintenance manager, and maintenance mechanic. (Tr. 163.) By May 2009, he earned a two year associate degree in applied sciences, but he relied on his wife to help him because it was very difficult for him to complete the program. (Tr. 42, 46.) Stanifer alleges a disability onset date of July 1, 2009, and the ALJ found that Stanifer's severe impairments included residuals from a stroke, obstructive sleep apnea, and attention deficit hyperactivity disorder (ADHD). (Tr. 21.)

### A.     Medical Background

As the ALJ pointed out in her opinion and as Stanifer's medical history demonstrates, Stanifer suffers from a host of non-listing level ailments, including:  history of a stroke, polyneuropathy, asthma, myalgia, arthragia, high blood pressure, tinnitus, gout, diverticulitis, hyperlipidemia, burning and swelling of the feet, knee pain, arthritis of the fingers, right shoulder pain, chest pain, sleep apnea, irritable bowel syndrome, headaches, vertigo, fatigue, ADHD, loss of concentration, and lack of focus (Tr. 208-399, 432-515, 518-627.) Stanifer also uses a cane as needed when his legs and knees hurt. (Tr. 161, 177.) Most important to this appeal is Stanifer's claim that despite the ALJ's discussion of his many problems, the ALJ did not adequately account for Stanifer's physical limitations with respect to his ability to walk/stand and Stanifer's mental limitations with respect to his ability to sustain attention.

Records show that as early as 1996 Stanifer sought work accommodations for his diagnosis of ADHD. (Tr. 208.)  At the time, a clinical social worker indicated that it would be significantly helpful if Stanifer was in charge of his own duties and responsibilities, had an

organized and clear communication system in place, and was provided times of privacy to complete tasks. His medical history also indicates that Stanifer had a diagnosis of polyneuropathy in October 2006 and a history of myalgia and arthralgia from February 2006. He also suffered from right knee pain as of August 2006. (Tr. 210.)

Medical records from 2007 indicate that Stanifer was being followed for a diagnosis of neuropathy by primary care physician, Dr. Mark Duvall. (Tr. 287, 288) At the time, Stanifer complained of burning in his hands and feet. While the etiology of the problem was undetermined, Stanifer had already been evaluated by two different neurologists. Stanifer continued to followup with Dr. Duvall for his pain issues. For instance, on April 15, 2008, he reported to Dr. Duvall that his feet were swelling and he had headaches and blood shot eyes. Myalgias were noted. Stanifer also expressed concern about memory problems. (Tr. 298)

Stanifer underwent a physical consultative examination by Dr. Luella Bangura on February 7, 2011. (Tr. 401-404.) On examination, she noted that Stanifer had decreased sensation and burning in his feet. Her diagnostic impressions were: ADHD, peripheral neuropathy, asthma, hypertension, bilateral tinnitus, chronic bilateral knee pain, gout, diverticulitis and sleep apnea. Dr. Bangura stated that Stanifer needed a psychiatric evaluation, an EMG for his lower extremities, an x-ray of his bilateral knees, and a pulmonary function test. She also recommended a hearing study, a uric acid study, and a repeat sleep study. Dr. Bangura offered the opinion that Stanifer would have difficulty standing and walking for long periods of time, but would not have difficulty sitting, carrying, lifting, speaking, handling objects, or seeing. She noted that he had a mental impairment that would affect his ability to sustain memory, concentration, and social interactions.

At the request of the Indiana Disability Determination Bureau, Stanifer underwent a psychological evaluation on February 12, 2011 by Licensed Psychologist Caryn Brown. (Tr. 405-408). During the examination, Dr. Brown noted that Stanifer had demonstrated some impairment in his ability to sustain concentration and attention. He had trouble staying on task and keeping information in working memory. Dr. Brown felt that Stanifer was cooperative, albeit irritable, and opined that the examination results were valid and reliable. His opinion was that Stanifer suffered a depressive disorder (NOS), a personality disorder with passive aggressive personality traits (NOS), and assigned a Global Assessment of Functioning Score (GAF) of 50.[1]

On February 15, 2011, state agent, Dr. Joelle Larson, Ph.D, filed a psychiatric review technique form indicating that Stanifer's mental impairments were not "severe." (Tr. 410-423). Dr. Larson did note that Stanifer suffered from depression, personality disorder with passive aggressive traits, and a history of ADHD. She opined that Stanifer was mildly limited in his ability to engage in activities of daily living, maintain social functioning, and maintain concentration, persistence, or pace. Ultimately, she believed that Stanifer was more limited by his physical impairments, rather than his psychological problems. Reviewing state agent William Shipley, Ph.D, affirmed Dr. Larson's opinion on May 23, 2011. (Tr. 516.)

---

[1] The GAF scale reflects a clinician's judgment of an individual's overall level of functioning and ability to carry out activities of daily living. *See* DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS-Text Revision 32 (4th ed. 2000). The higher the GAF score, the better the individual's level of functioning. While GAF scores have recently been replaced by the World Health Organization Disability Assessment Schedule, at the time relevant to Stanifer's appeal, GAF scores were in use. *See* Wikipedia, Global Assessment of Functioning, http://en.wikipedia.org/wiki/Global_Assessment_of_ Functioning (last visited Jan. 24, 2015). A GAF score of 41-50 indicates serious symptoms, such as suicidal ideation, severe obsessional rituals, frequent shoplifting, or any serious impairment in social, occupational, or school functioning, such as no friends or unable to keep a job.

On February 28, 2011, Dr. Richard Wenzler, completed a physical RFC[2] assessment, opining that Stanifer could lift 50 pounds occasionally and 25 pounds frequently, and stand/walk 6 hours and also sit about 6 hours in an 8 hour workday. (Tr. 424-431.)  Dr. Wenzler did not believe Stanifer suffered any restrictions with his ability to push/pull hand or foot controls.  Dr. Wenzler indicated that Stanifer had no postural limitations (except he could not climb ladders, ropes, or scaffolds), and no upper extremity manipulative limitations, visual limitations, communicative limitations, or environmental limitations (except that he could not work around unprotected heights).  Dr. Wenzler noted that the claimant was credible with respect to his history of neuropathy, but not credible with respect to the alleged severity or the date of onset. Reviewing state agent J. Sands, M.D., affirmed Dr. Wenzler's opinion on May 25, 2011.

On July 20, 2011, Stanifer was seen in the emergency room at IU Arnett Hospital for headaches. He felt like the room was spinning. He reported being fatigued and that he had worsening fatigue for the past several years. (Tr. 518, 523.) He reported having trouble focusing and remembering things.  A CT scan of the head was normal. Stanifer's blood pressure was quite high upon admission. The vertigo improved some with a dose of meclizine. He was admitted to the hospital. (Tr. 522, 530.) The next day an MRI was conducted and findings included a band of encephalomalacia (softening or loss of brain tissue following brain injury) involving the posterior and medial left temporal lobe extending into the left occipital lobe. It was noted that this may reflect an old infarct. (Tr. 531.) Further, the MRI showed mild cerebral atrophy with mild periventricular small vessel disease.

---

[2]Residual functioning capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting.  20 C.F.R. § 404.1545(a)(1).

On September 9, 2011, Stanifer was again seen in the emergency room for stroke symptoms. (Tr. 538-539.) He had a watering eye, double vision, and a right sided headache. He was diagnosed with acute nonspecific cephalagia (headache) and diplopia (double vision). He was discharged as stable and the report indicated that he already had an appointment with a neurologist in the coming week. (Tr. 542.)

Stanifer saw neurologist, Dr. Sara Huffer, on September 13, 2011. (Tr. 595.) She noted a number of neurologic problems including a transient episode of amnesia in 2004, an episode of left sided numbness and tingling, several weeks of headache and vertigo in July 2011, and the recent episode of right eye tearing and vertical diplopia. Her notes indicate that Stanifer was given propranolol for headaches and it was having an impact on his exercise tolerance. Stanifer was also complaining of worsening concentration. (Tr. 595) He was still having headaches and what Dr. Huffer described as neurologic dysfunction that may be TIA (transient ischemic attacks) or other. She noted the brain lesion discovered in the July MRI. She also diagnosed axonal polyneuropathy. He was told to continue with the propranolol to keep the headaches and blood pressure under control.

On September 14, 2011, Stanifer underwent a diagnostic sleep study at the Indiana University-Arnett Sleep Center. (Tr. 575-576, 600.) The testing showed severe central sleep apnea with unsuccessful titration of the CPAP/BiPAP due to persistent central events. Dr. Wu reviewed the findings and noted that Stanifer had in the past refused the CPAP. Stanifer was told not to drive until the sleep apnea was controlled. On October 17, 2011, Stanifer underwent another sleep study due to his hypersomnia to titrate a new BiPAP machine. (Tr. 565-567.) In late 2011, it was also noted that Stanifer's fatigue might be related to his testosterone levels. (546.)

6

**B.      Hearing Testimony**

Stanifer, his wife, Lee Stanifer, and the vocational expert, Thomas Gusloff (VE), all testified at the hearing on June 28, 2012, and Stanifer was represented by counsel. (Tr. 39-67.) Stanifer indicated that he previously worked for many years as a maintenance mechanic and maintenance manager, and in 2009 he had received an associate degree after much difficulty and reliance on his wife.  Stanifer indicated that until 2009, he had learned ways to deal with his ADHD, but since then he has been unable to remain on task, stay organized, and deal with other people.  Physically, he has had increased difficulty with walking, and has caught himself almost falling many times.  Stanifer explained how his feet and knees swell up and hurt, causing him to have some good days and some bad days.  Stanifer testified that when his feet and knees aren't hurting, which is about half of the time, he is able to stand for about 45 minutes at a time. Otherwise, he can stand/walk for only up to 10 minutes at a time, for a total of 2 to 3 hours in an 8 hour day, and he must alternate positions between sitting and standing.  Stanifer uses ice, medicine, and lotion to help with his foot and knee pain.  Stanifer further explained how his hands cramp up with use, he frequently has headaches, his memory is terrible, he is unable to control his frustration with people, and he no longer has the focus to complete projects in one sitting.  Stanifer testified that his onset date, July 1, 2009, was the moment in time when he believed he could not work anymore due to all of his medical conditions and so he stopped looking for work.

In a typical day, Stanifer stares at the walls, completes some chores (but can no longer cook or clean dishes), uses the internet, and may mow the lawn over the course of a couple of days.  At one point, the ALJ asked whether Stanifer was being compliant with his medications, to which Stanifer indicated he is compliant with the exception of one prescription for his

neuropathy which he was discussing with his doctor due to the negative side effects. Notably, the ALJ did not specifically ask Stanifer about his *past* compliance with taking his medications.

Stanifer's wife confirmed that Stanifer does not wash dishes because he drops them, he cannot cook because he forgets about the food, and when he drives he gets easily irritated and can no longer control the car due to his inability to concentrate.

The VE indicated that Stanifer's past work as a maintenance supervisor of equipment and machinery, a maintenance supervisor of buildings and structures, and a maintenance mechanic, all consisted of skilled work, which ranged from the light to very heavy exertional levels.

In addition, the ALJ questioned the VE about the availability of jobs for a hypothetical individual of Stanifer's age, education, and work experience who retained the RFC to lift and carry 50 pounds occasionally and 25 pounds frequently; stand/walk for 6 hours and sit for 6 hours; could never climb ropes, ladders or scaffolds; could occasionally be exposed to pulmonary irritants, but could not be exposed to unprotected heights or dangerous machinery. With this hypothetical person in mind, the VE testified that Stanifer could still perform his previous work as a maintenance supervisor for equipment and machinery. He could also perform other work as an extrusion press operator (light, low level skill), service supervisor for leased machinery and equipment (light, skilled), and electrician supervisor (light, skilled). The VE further testified that if the hypothetical person could not sustain concentration, persistence, and pace for two hour increments, then the individual would not be able to maintain any level of work due to being off task.

## C.    Post Hearing Evidence

At the conclusion of the June 28, 2012 hearing, ALJ Laurel Green indicated she was going to send Stanifer out for physical and psychological consultative examinations because she

needed more information before she could evaluate Stanifer's condition. (Tr. 65.)  For reasons

not indicated in the record, Stanifer was never sent for a physical exam.

However, on July 23, 2012, Dr. Paul Roberts, a forensic neuropsychologist, administered

a psychological evaluation and conducted a Halstead-Reitan Neuropsychological Test Battery.

(Tr. 628-635.)  While most scores were in the average range, Dr. Roberts assessed that 14% of

the testing was in the impaired range. Dr. Roberts believed that Stanifer provided his best effort

without symptom exaggeration and that the findings were valid and accurate. In his conclusions

and summary, he noted that Stanifer had a dysthymic affect, disturbed sleep, and reduced

appetite. He noted that Stanifer was only able to follow simple instructions with repetition, and

that his attention and sustained concentration were variable. Episodic and semantic memory

appeared to be mildly impaired.  He provided diagnosis of ADHD and sleep disorder, and

assigned a GAF score of 58.[3]  He indicated that Stanifer had mild limitations with understanding,

remembering, and carrying out simple instructions and making simple work-related decisions.

However, there would be moderate limitations with understanding, remembering, and carrying

out complex instructions.  In handwritten notes, Dr. Roberts twice pointed out that Stanifer had

"significant difficulties with sustained attention" and that instructions required repetition. (Tr.

636, 637.) Dr. Roberts noted that during the exam Stanifer sat somewhat uncomfortably with

infrequent repositioning, and he had at one point complained because the cold lobby aggravated

his neuropathy in his lower extremities.  Dr. Roberts also opined that further assessment was

needed due to Stanifer's physical complaints.

---

[3]A GAF rating of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

The ALJ took Dr. Roberts' exam results into consideration in rendering her decision, and in fact afforded Dr. Roberts' conclusions "great weight." (Tr. 29.)

**D.      The ALJ's Decision**

The ALJ made the following findings (Tr. 20-33): Stanifer suffered from severe, non-listing level, impairments that included residuals from a stroke, obstructive sleep apnea, and ADHD.  Relying on Joelle Larson's February 2011 psychiatric review technique, Paul Roberts forensic neuropsychological exam from July 2012, and the "[unidentified] objective medical evidence of record," the ALJ determined that Stanifer's mental impairments produced mild difficulties in activities of daily living and maintaining social functioning, with moderate difficulties in maintaining concentration, persistence, or pace.

The ALJ found that Stanifer retained the RFC to lift and carry 50 pounds occasionally and 25 pounds frequently; stand/walk for 6 hours and sit for 6 hours in an 8 hour workday with normal breaks; could never climb ropes, ladders or scaffolds; could occasionally be exposed to pulmonary irritants, but could not be exposed to unprotected heights or dangerous machinery, and was limited to simple, routine, and repetitive work.

The ALJ determined that Stanifer's allegations of disability were not entirely credible, in relevant part because despite testifying to being compliant with his medications, medical records indicated that Stanifer had discontinued prescription treatment against medical advice in the past. In addition, Stanifer testified that he had an associate degree, but told Paul Roberts that he had barely made it out of high school and had to attempt college a number of times.  The ALJ additionally thought that Stanifer's claimed exertional limitations were not consistent with the objective medical evidence—but as will be discussed, the medical evidence upon which the ALJ relied heavily didn't adequately support her conclusions.  In making her assessment, the ALJ

gave the July 23, 2012 psychological assessment of Paul Roberts "great weight," without ever discussing Roberts' notations concerning Stanifer's significant difficulties with sustaining attention and need to have additional physical evaluations conducted.

The ALJ believed that although Stanifer could not perform his past work, his limitations (as noted in the RFC) had little or no effect on the occupational base of unskilled medium work, and therefore consistent with Medical Vocational Rule 203.15, Stanifer was not disabled. In making this finding, the ALJ relied on the grids and did not rely on the testimony of the VE who only offered an opinion with respect to a hypothetical individual who was not limited to simple, routine, and repetitive unskilled work.

### III.  Standard of Review

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, this Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or

substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Furthermore, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### IV. Analysis

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2.  Whether the claimant has a medically severe impairment;

3.  Whether the claimant's impairment meets or equals one listed in the regulations;

4.  Whether the claimant can still perform relevant past work; and

5.  Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner.  20 C.F.R. § 404.1520(a)(4)(iii).  However, if a listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform his past work under step four and whether the claimant can perform other work in society at step five of the analysis.  20 C.F.R. § 404.1520(e).  The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Stanifer essentially challenges the ALJ's decision on three grounds: (1) that the ALJ failed to properly analyze Stanifer's credibility; (2) that the ALJ failed to make a proper RFC assessment (by not sufficiently considering his limited ability to stand/walk and his inability to sustain attention/pace); and (3) that the ALJ committed error at Step 5 in finding that Stanifer was capable of performing unskilled medium work.  The Court finds that the ALJ's opinion is not adequately supported in all of these respects, and therefore remand is required.

**A. The Credibility Finding and The RFC Assessment (with respect to walking/standing & sustaining attention/pace)**

The ALJ must determine an individual's RFC, or "what an individual can still do despite his or her limitations," SSR 96–8p, based upon medical evidence as well as "other evidence, such as testimony by the claimant." *Murphy v. Colvin,* 759 F.3d 811, 817 (7th Cir. 2014) (citation omitted)*; see* 20 C.F.R. § 404.1529(a) (in making a disability determination, the ALJ must consider a claimant's statements about his symptoms, such as pain, and how his symptoms affect his daily life and ability to work).  In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, "even [limitations] that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Id.* (quoting *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009)).

The ALJ determined that Stanifer had the ability to perform a full range of unskilled medium work, with some nonexertional limitations that had little effect on the occupational base of unskilled medium work. (Tr. 23, 32). Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c).  Additionally, a full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8 hour workday.  SSR 83-10.  In most medium work jobs, being on one's feet for most of the workday is critical. *Id.*

In assessing Stanifer's RFC, the ALJ first considered the credibility of Stanifer's testimony (which was previously summarized herein), and determined that Stanifer was not entirely credible with respect to his complaints about the intensity, persistence, and limiting effects of his symptoms.  In making this finding, the ALJ properly considered various factors relevant to Stanifer's symptoms, such as Stanifer's ability to complete daily activities, the

location and frequency of his pain and other symptoms, and his medication and other methods of treatment along with any side effects. *See* 20 C.F.R. § 404.1529(c)(3); SSR 96–7p.

Accordingly, the problem with the credibility analysis was not a failure to discuss the many factors necessary to making a credibility finding. *See id.* Instead, the shortcoming in the ALJ's opinion was her mischaracterization of Stanifer's testimony, and her discounting of Stanifer's testimony on account of these mischaracterizations. *See Terry v. Astrue,* 580 F.3d 471, 477-78 (7th Cir. 2009) (although an ALJ's credibility finding is afforded "considerable deference" and is overturned only if "patently wrong," the ALJ must consider the claimant's level of pain, medication, treatment, daily activities, and limitations, 20 C.F.R. § 404.1529(c), "and must justify the credibility finding with specific reasons supported by the record") (citations and internal citations omitted). This misstep calls into question the soundness of the ALJ's reasoning for discounting Stanifer's complaints, which then served as a basis for the ALJ's ultimate RFC finding. *See id.* (remanding where the ALJ mischaracterized the record resulting in an adverse credibility determination that was not supported by the record).

To begin with, the ALJ concluded that Stanifer's claimed limitations were not entirely credible because despite testifying to being compliant with his medications, Stanifer's medical records indicated that he had previously discontinued prescriptions against medical advice. But during the course of the administrative hearing, the ALJ never asked Stanifer about his *past* compliance with medication. Rather, the hearing transcript makes clear that the ALJ only asked Stanifer what medications he was currently taking, and whether he was being compliant with his treatment at the time. (Tr. 49.) In response to these questions, Stanifer explained how he was currently working with a treating doctor with respect to one of his medications for neuropathy due to its negative side effects, and otherwise, he was then taking his medication as prescribed.

15

But the ALJ misconstrued Stanifer's testimony to mean he has always been compliant with his medications, when the record does not support such an interpretation. Therefore, the ALJ was wrong to call into question Stanifer's claimed limitations on this basis.

In addition, the ALJ improperly determined that Stanifer had made inconsistent statements with respect to his receipt of a college degree. During the hearing, Stanifer testified to having great difficulty securing his associate degree and mentioned having to rely on his wife to pass the courses. During his psychological exam with Paul Roberts in July 2012, Stanifer reported to Roberts that he had difficulty graduating from high school and had dropped out of college several times before earning his degree. As a result, the ALJ "detract[ed] from the claimant's allegations of disability" due to these "inconsistencies." (Tr. 30.) But there were no inconsistencies because the ALJ never bothered to ask Stanifer if he had difficulty graduating from high school or had previously attempted college. Moreover, Stanifer did testify to having trouble securing his college degree. In short, Stanifer's subsequent statements to Paul Roberts were not inconsistent with his actual testimony, and the ALJ's use of these alleged mischaraterizations to discredit Stanifer's allegations of disability were in error.

The ALJ additionally thought that Stanifer's claimed exertional limitations were not consistent with the objective medical evidence. But this finding, at least with respect to Stanifer's limited ability to stand/walk, is flawed for the two reasons further detailed below. First, the ALJ incorrectly reported Stanifer's stated ability to stand/walk at the outset. And second, substantial evidence doesn't support the ALJ's finding that Stanifer can stand/walk for 6 hours in a workday.

In assessing Stanifer's physical RFC, the ALJ discussed Stanifer's testimony explaining that even despite pain and swelling in his lower extremities, Stanifer testified to being able to

"stand at least 3 to 4 hours, [and] sit for even longer." (Tr. 25.) But, the ALJ misstated Stanifer's testimony and omitted Stanifer's other contextual comments. In reality, Stanifer testified that his foot and knee pain caused him bad days and good days. On Stanifer's bad days, which occurred about half of the time, Stanifer indicated that he was then able to stand/walk for only up to 10 minutes at a time. And he probably spent a total of 2 to 3 hours standing/walking in an 8 hour day, with alternating between sitting and standing/walking.

Despite this testimony, the ALJ never referred to the fact that Stanifer's pain would cause him good days and bad days, nor did the ALJ explain whether she specifically disbelieved this testimony and Stanifer's stated need to alternate between sitting and standing/walking. Ultimately, the ALJ failed to properly evaluate Stanifer's *stated* limitations when assessing Stanifer's credibility and RFC, along with the medical evidence. SSR 96-7p. Given the various mischaracterizations of Stanifer's testimony, the court lacks a sufficient basis upon which to uphold the ALJ's determination of Stanifer's credibility and the RFC assessment upon which it rests. *See Minnick v. Colvin,* No. 13-3626, 2015 WL 75273 (7th Cir. Jan. 7, 2015) (without a logical bridge between the evidence and the ALJ's conclusion, there is not a sufficient basis upon which to uphold the ALJ's determination of the claimant's credibility).

With respect to the medical records evidencing Stanifer's ability to stand/walk, the ALJ gave "great weight" to Dr. Bangura's opinion which indicated that Stanifer "would have difficulty standing and walking for long periods of time." Although Dr. Bangura did not state exactly how long she believed Stanifer could walk/stand, she did recommend significant followup testing in relevant part for Stanifer's neuropathy, chronic bilateral knee pain, and gout.

Despite this evidence upon which the ALJ heavily relied, the ALJ concluded that Stanifer could still perform medium work, where being on one's feet for most of the workday is critical

and necessitates the ability to stand/walk for 6 hours.[4]  20 C.F.R. § 404.1567(c); SSR 83-10.

However, Dr. Bangura's opinion does not support the ALJ's conclusion, and the only physician who specified such exertional limitations was Dr. Wenzler—who had advised that Stanifer could stand/walk for up to 6 hours at a time.  But, Dr. Wenzler gave his assessment in February 2011 and he had no knowledge about the exacerbation of Stanifer's neuropathy and stroke symptoms which occurred after Dr. Wenzler gave his opinion. *See, e.g., Staggs v. Astrue*, 781 F.Supp.2d 790, 794-96 (S.D. Ind. 2011) (finding that the medical record omitted from review provided significant substantive evidence regarding the claimant's medical impairments and that any medical opinion rendered without taking this subsequent record into consideration was incomplete and ineffective).  And even the post-hearing opinion of Dr. Roberts, whose opinion was given "great weight" by the ALJ, indicated that further assessment of Stanifer's physical complaints, including his neuropathy, was necessary.  So too, the ALJ believed that further physical examination was necessary in order for her to completely evaluate Stanifer's condition—as evidenced by her comments at the conclusion of Stanifer's hearing.

But the updated physical assessment of Stanifer was never performed for reasons not explained by the ALJ, and in spite of evidence indicating Stanifer's worsening condition and need for an updated evaluation.  On remand, the ALJ shall either order an updated physical examination as she told Stanifer she would, *see* 20 C.F.R. § 404.1519a, or at least explain why one is no longer deemed necessary. *See Wilcox v. Astrue,* 492 F. App'x 674, 678 (7th Cir. 2012) (the need for additional tests or examinations will normally involve a question of judgment, and

---

[4]Even light work as defined by the regulations requires "a good deal of walking or standing," whereas sedentary jobs require walking and standing only occasionally. 20 C.F.R. § 404.1567(a), (b).

the court generally defers to the ALJ's determination whether the record before her has been adequately developed).

With respect to Stanifer's mental limitations, Stanifer testified to his inability to stay on task and focus long enough to complete projects in a single sitting. The record is also replete with notations to Stanifer's limited ability to sustain concentration and attention, and the ALJ gave great weight to the opinions of Drs. Bangura and Roberts who indicated that Stanifer would certainly have limitations sustaining attention and concentration. Consistent with the evidence that Stanifer had these mental limitations, the ALJ determined that in fact Stanifer suffered from moderate difficulties in maintaining concentration, persistence, or pace. For this reason, the ALJ indicated that she was accommodating Stanifer's limited ability to sustain concentration, persistence, and pace, by limiting Stanifer to simple, routine, and repetitive unskilled work. However, the ALJ did not adequately explain what evidence supported her conclusion that merely limiting Stanifer to simple, unskilled work actually accounted for Stanifer's problems with sustaining attention, concentration, and pace.

The Seventh Circuit has previously indicated that limiting a claimant to simple, routine, and repetitive work does not necessarily address the claimant's deficiencies of concentration, persistence and pace. *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 620-21 (7th Cir. 2010). And therefore, an ALJ must specifically account for a claimant's ability to stick with a task (even if limited to unskilled work) over a sustained period. *See Warren v. Colvin*, 565 F. App'x 540 (7th Cir. 2014). Here, the ALJ committed error by not explaining what evidence supported her belief that Stanifer was able to complete tasks, even if repetitive and simple, over a *sustained* period of time at a *competitive pace*. For this additional reason, remand is required.

On remand, the ALJ must justify the credibility finding with specific reasons supported by the record, *Terry*, 580 F.3d at 477, analyze the claimant's mental and physical impairments in combination, and sufficiently explain her analysis of the evidence supporting her ultimate RFC determination. *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012).

**B.      Stanifer's Ability to Perform Work**

At step five of the sequential analysis, an ALJ must determine (taking into account the step four finding that a claimant can no longer perform his past work) whether he can do any other work that exists in the national or regional economy. *See* 20 C.F.R. § 404.1520(a)(4)(v), (e).  To this end, the ALJ may use the grids to determine whether other jobs exist in the national or regional economy that a claimant can perform. *Fast v. Barnhart,* 397 F.3d 468, 470 (7th Cir. 2005).  The grids, however, generally take account only of exertional impairments—those that affect the claimant's "ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." *Id*. (quoting 20 C.F.R. § 404.1569a(b)). Nonexertional impairments—such as depression, anxiety, difficulty remembering or maintaining attention or concentration—are defined as all other impairments that do not affect a claimant's ability to meet the strength demands of jobs. *Id*. (citing 20 C.F.R. § 404.1569a(c)(1)). Where a nonexertional limitation might substantially reduce the range of work an individual can perform, use of the grids is inappropriate and the ALJ must consult a VE. *Id*. (citing *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001); *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)).

Though the ALJ asked VE Gusloff hypothetical questions that pertained to Stanifer's ability to work, she ultimately did not rely on the VE's opinion.  Instead, the ALJ found that any of Stanifer's additional nonexertional limitations had little or no effect on the occupational base of unskilled medium work, and therefore under the grids, Stanifer was deemed not disabled.

20

However, since the ALJ did not properly assess Stanifer's credibility or provide an adequate explanation for finding that he had no further nonexertional limitations, the Court has no way of knowing whether Stanifer's RFC assessment included all of the limitations that should have been included based on the record evidence. If, on remand, further nonexertional limitations are provided in the RFC, especially given Stanifer's apparent limitations with sustaining attention and pace, then the ALJ will need to consult a vocational expert. *See Murphy v. Colvin*, 759 F.3d 811, 820 (7th Cir. 2014) (noting that an RFC determination must account for all impairments, even those that are not severe; and, by erroneously finding the claimant less than credible, the ALJ failed to give an accurate RFC assessment, and as a result, could not rely solely on the grids).

The Court would note that even had the ALJ relied on VE Gusloff's opinion, remand of the case would still be necessary because the ALJ did not incorporate in her hypothetical questions Stanifer's need to be limited to unskilled work. *See Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007) (noting that the ALJ is required to include in the hypotheticals those limitations that the ALJ accepts as credible). Moreover, it is clear that the VE did not independently include the unskilled work limitation into the hypothetical,[5] given that VE Gusloff's responses indicated Stanifer was capable of performing various jobs which required

---

[5]Admittedly, the Seventh Circuit has occasionally concluded that a VE has familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations and the VE considered that evidence when indicating the type of work the claimant is capable of performing. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, n. 5 (7th Cir. 2010) (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Young*, 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 819-21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)). This exception does not apply here, since the VE never indicated having reviewed Stanifer's medical records, nor did he indicate in his responses having relied on those records or the hearing testimony. Rather, the VE's attention was on the limitations of the hypothetical person posed by the ALJ, rather than on the record itself or the limitations of the claimant himself. *Id.* (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003).

skill.  Until the ALJ provides adequate support for her RFC findings, which can then be used as the basis for reliance on the grids or for posing hypotheticals to the VE, steps four and five cannot be properly analyzed in this appeal. SSR 96-8p.

## V.  Conclusion

For the foregoing reasons, the Court GRANTS Robert Stanifer, Jr.'s request to remand the ALJ's decision. [DE 1.]  Accordingly, the Court now REMANDS this case to the Commissioner for further proceedings consistent with this Opinion and Order.

SO ORDERED.

ENTERED:  February 3, 2015

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court